The Honorable Judge of the United States Court of Appeals, in and before the Second Judicial Circuit. Hear ye, hear ye, hear ye. All persons having business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and its Honorable Court. Good afternoon, ladies and gentlemen. We're here for the Webster v. Watson case, and we'll begin with the appellant, Ms. Cox. Yes, thank you, Your Honor. May it please the Court, my name is Erin Neely Cox. I'm the United States Attorney for the Northern District of Texas. Together with my colleague, Leah Simonton, we represent the United States. There are two issues before the Court. I'll be addressing the first issue, what is deemed the threshold issue, which is, did the District Court clearly err when it credited the testimony of trial counsel and found that he exercised due diligence, therefore concluding that the records were unavailable to counsel? Ms. Simonton will argue the second issue, whether the Court erred in finding that the defendant was intellectually disabled and in vacating the death sentence. In terms of the threshold issue, I'd like to make two points. First, that defense counsel's testimony should not have been credited by the District Court. And second, even if this Court does credit the testimony of counsel, defendant does not satisfy the due diligence requirement. So in looking to the first issue, whether the District Court erred in crediting the testimony, I would turn first to the irreconcilable differences in the testimony before the Court. Looking first at the affidavit, the sworn testimony of Larry Moore from October of 2009, this was 13 years after the trial. Mr. Moore says he has no direct recollection of asking about the records and only a good faith belief that he must have been told the records didn't exist. Then moving forward to 22 years after the dates in question, he has a very specific memory that he personally followed up. And he cannot remember in that sworn affidavit whether or not it was by phone or in person. And then finally at the June 2018 hearing, suddenly we learn that he has recalled that it is now indeed he personally followed up by phone. He suddenly remembers the name of the person at the Social Security office that he spoke to. And we also learn for the first time that his investigator by the name of Strickland also told him that he was told there were no Social Security records in existence. There is no way to reconcile these shifting stories. The testimony is evolving and not in a credible way. Each iteration becomes... Counsel? Yes, Your Honor. As I read your argument and hear what you have to say on this credibility question, you're arguing that the district judge credited, quote, exceedingly improbable testimony. Can you direct us to examples of cases where we have rejected credibility findings like those here? Your Honor, I could not. I looked for Seventh Circuit cases to see, and I am very aware, Your Honor, that the standard of review is a demanding standard. It is. And then in reading this argument, I have to compare this case to appeals that we see in much higher volume. For example, in challenges to district judges' decisions about the credibility of what co-defendants have to say at sentencing, let's say about drug cases or other joint criminal activity, where the testimony that's credited comes with terrible credibility problems. Not only the felony conviction of the co-defendant, plenty of inconsistent statements, lots of arguments about self-interest. And we routinely say that if the district judge decides to credit the version at sentencing, that's good enough for us. Why is this different? So – and I agree with Your Honor. The testimony, it is a very demanding standard. I'm particularly fond of the Seventh Circuit's way of phrasing it when they said the testimony must be wrong with the force of a five-week-old unrefrigerated fish. It's my position, Your Honor, that this record on its face does smell. In fact, it stinks. And if you look beyond the testimony and look to see if there's anything other than the testimony that corroborates the trial counsel's story, because common sense tells us that memory fades over time, there's nothing in this file. There's no notes. There's no memo. Common sense says that, but experience and lots of cases tell us that memories can be jogged, that memories can be refreshed. That's true. That's true. And Judge Lawrence is a veteran judge, lots of experience evaluating these kinds of things. Why is this so terrible? Well, Your Honor, that's true. It is true that the trial counsel in this case said that his memory was refreshed, but there's nothing in the trial case file to refresh his memory. There's not one single thing. And in the trial case file, it's very well documented, and what we're dealing with is experienced death penalty counsel, and he knows how he must document his case file. And in fact, there's the best evidence of documenting his case files when he asks for these Social Security records, and he documents the FedEx label and the fact sheet. And there's another great example of documenting the lack of records from a government agency. It's Webster's Exhibit 41, which is when he asks for records from the Arkansas Department of Health, and they send back a statement that they don't have records. He not only has the statement, he has the affidavit of Webster, and he has a copy of the envelope. So we see that the trial case file is replete with meticulous documentation, and yet there is nothing in this case file that corroborates his testimony that would suggest to the court that he has refreshed his testimony. There's not a note from him. It's Judge Scudder. I want you to react to a couple of things and tell me why you think this line of thinking is misguided. When I look at Mr. Moore's testimony, one of the things that stood out we're talking about, and that is access to his file. He was able to see it, read his own handwriting, look at documents, and refresh his recollection, at least as he testified, in much more meaningful detail than not having the file at his fingertips. The other thing that he said in his testimony is that since 1996, he estimated that he's tried 100 cases. And so what I wondered about in reading that is why isn't it credible, or why couldn't a district court judge find that it's credible? When you're dealing with an attorney with that many cases, that many different intervening matters to handle, that it's quite important to get your fingertips on the file as a way of refreshing yourself as to what happened. Think of your own experience as a lawyer in a job busy like yours. Why doesn't it just align with your common sense? Yeah, I would agree, Your Honor, and in fact, my second point that I wanted to make was that you can certainly – if you choose to credit the testimony of the lawyer, you can accept what he's saying 22 years later as accurate. But then you also have to accept his position that these records were critical and that they could mean the difference between life and death. And this – the fact that there's nothing in the file, that he never reviewed the file, the fact that there is – he allegedly calls the Social Security Administration. But he didn't review it in 2009. It's an answer that doesn't make sense. He didn't review it in 2009 because he didn't have it. Yes, it was with Dorsey at that time. Right. That is the case. He gets it later, and surely we're not going to fault him for reviewing it. No, I would not fault him for reviewing it. But what I'm suggesting is it's not – it's implausible that his review of the case file would give him the newfound facts that he seems to remember with perfect recall. And just – I know my time is up, but just as a further point, the court does not have to make a credibility determination that he was not being credible. They can look to the due diligence and the lack of any documentation or any follow-up with the Social Security Administration and find that that was not due diligence on such critical evidence. My time is up. I'll leave the rest of my time for rebuttal. Thank you, Ms. Farr. May it please the Court, Leah Simonson for the United States and the Northern District of Texas, on the second issue, which is assuming that the district court did not clearly err on the threshold issue of whether Mr. Moore exercised due diligence, did the court clearly err in determining that Mr. Webster's adaptive functioning was so low, so deficient, that he is considered intellectually disabled? To set the scene for the context in which the district court in 2019 made its decision that Mr. Webster had adaptive functioning deficits, it's important to go back to 1996. In 1996, there were 52 witnesses who testified at the original sentencing hearing in Fort Worth. Most of them, or at least half, half to most, testified in regard to some aspect of adaptive functioning. We had expert witnesses, but we also had several other types of witnesses who knew Mr. Webster from various walks of life. We had family members, girlfriends. We had former employers. We had people who were familiar with him from school, two teachers, a counselor, and two principals. We had people who knew him from the detention center where he was housed before trial. We had a fellow inmate from there, and we had people who knew him from the investigation into Lisa Renee's murder, who interacted with him in terms of showing how he recalled many, many aspects of the crime during their investigation and in his confession. That was coupled also with testimony from various experts, including two on the government side, Dr. Parker and Dr. Coons. So we have these 1,200 pages of record, and on that basis, Judge Terry Means in Fort Worth, Texas, after giving it a lot of thought, reached the decision that Mr. Webster was not intellectually disabled, and the Fifth Circuit has affirmed that conclusion. Now, we know from a later opinion that Judge Means issued in 2003 that the basis for his finding was adaptive functioning. That was the key to his decision that Mr. Webster was not intellectually disabled. The Fifth Circuit affirmed, again, the 2055 denial based on the fact that Mr. Webster did not show significant adaptive functioning deficits, given the way the district court had weighed the evidence. And those are the 2003 and 2005 opinions in the separate appendix that we provided the court. Fast forward to 2019, Southern District of Indiana. The court hears from seven witnesses over the span of a week. It also says that it's going to take into consideration the entire trial transcript, which actually is about 5,000 pages, but 1,200 pages. That includes Ward I or II. So we have also a significant amount from the trial, where we had a testimony from co-defendants on Mr. Webster's behavior, and then additionally, we had the 1,200 pages of sentencing. To aid the court in that, the government provided 41 exhibits that were excerpts from that trial testimony in 1996. And in its post-hearing brief, the government spent 34 pages discussing largely that testimony, along with the relatively small amount of testimony that the court heard in 2019 and, of course, the Social Security records. The government broke up its analysis of adaptive functioning by domain and by subcategory within the domain and explained how all of these pieces fit together and still supported the original district court finding from Fort Worth, Texas in 1996 that Mr. Webster did not show significant adaptive functioning deficits. In light of all that, the district court issues an opinion that is on the adaptive functioning side. If you take out the pictures of Mr. Webster's Social Security application, four pages. It was four pages of reasons that convinced the court that he had adaptive functioning deficits. Not just the fact that it's four pages, but also the fact that the district court in Indiana did not discuss any of the testimony that had occurred in 1996. Nothing. And that was in the face of Judge Means having outlined in detail what all of the relevant people had testified to in 1996 and how that fit into his decision on intellectual disability. So we have the district court seeming to ignore the 1,200 pages of testimony. Instead, the district court cited only three things in support of its decision on adaptive functioning. The testimony of Webster's two experts at the 2019 hearing, Drs. Fabian and Reschle, and Mr. Webster's handwriting on the Social Security application. Not even any of the physician's assessments or psychologist's assessments of Mr. Webster. None of that. None of that that was what helped the en banc court decide to remand the case to the Southern District of Indiana. No. It was just looking at the handwriting and the district judge said the handwriting's really bad. It suggests he's barely literate. Therefore, he has adaptive functioning disorders. Now, on the subject of handwriting, not one expert has said that bad handwriting equals intellectual disability. And we know that it doesn't. We know that there are academic disabilities like dyslexia and dysgraphia that can cause handwriting. We also, I must point out, don't even know for sure that that was Mr. Webster's handwriting on the application because that was questioned at the 2019 hearing. There were multiple types of handwriting on the form. That was admitted by Mr. Webster's experts. That's in pages 333, 331 of the hearing transcript. Other people might have filled out that application for Mr. Webster. We know that from the original sentencing hearing where his mother and one of his girlfriends said he did not like to fill out applications. It's not that he couldn't. He didn't like to. That's part of sort of his antisocial personality disorder. And so he had other people fill them out. Yes. Yes, sir. A couple of questions. Your time is short and I just want to get these out on the table. First of all, what do you understand to be our standard of review on this question about whether Mr. Webster suffers from intellectual disability? And I was wondering if you could also address this troubling spoliation issue that's part of the case. The district judge didn't decide it. But where apparently the Social Security Administration destroyed documents in 2010 after Mr. Webster's lawyers had requested. I don't want to be too glib about the unitary theory of the executive. But we are talking here about two parts of the federal government. One that's working hard to see that he's executed for this horrific crime. And the other that's destroying documents that are highly relevant to his intellectual disability defense. Sure, Your Honor. The standard of review is clear error and the district judge used the burden of proof of preponderance of the evidence. And we don't dispute that. I think the parties agree on that. As to your second point, what I would point you to, that's not something that we've briefed. I'm happy to provide additional briefing on the spoliation issue. But what I would point you to is the government's surreply on Mr. Webster's motion to depose a Social Security representative in the district court record in the Southern District of Indiana. And that has extensive briefing on why. Okay, great. So that's the starting point. And there's a Seventh Circuit case. There's other persuasive authority. But there's a second Seventh Circuit case in the surreply that establishes. And I think Ms. Neely-Cox actually can also address this, too. But it is – I can't remember the name of it right now because we have not briefed the issue, but I have read that. And it establishes as precedent that another agency that's not involved in sort of the prosecution team universe is not responsible. I will also say that we in the Northern District of Texas did not know that they were looking for these records. And the idea that we might have communicated something to Social Security in terms of causing them to destroy any records, that's absolutely unfounded and it's not true. If you look at that question from the perspective of allocating blame and was there professional misconduct within the Department of Justice anywhere, I realize that's an entirely different question. When the question is, should the government put Mr. Webster to death when the government destroyed exculpatory documents relevant to his intellectual disability, it's hard for me to look away from that. So Your Honor, just to start with the premise of that, there's no evidence that there are any exculpatory documents. There's no evidence there's any, for example, doctor's assessments that are not included within these records. We have three doctor's assessments. Most of, if you look at the Social Security records we have, are really not that relevant because they don't have doctor's notes. What we do know about the Social Security records is they cut against Mr. Webster. For one, the Social Security application was denied. So, you know, even though there's some discussion of his intellectual capabilities in the records, we know that the Social Security office clearly did not think that he warranted disability. And so the idea that there's some other magic bullet that's in these records, Social Security does not have any long-term... Does intellectual disability automatically qualify for disability under the Social Security Act? I think basically it does, Your Honor. They also look at what types of jobs can be performed, but I will say that Mr. Webster had other family members who were on disability for... He had one who was on for intellectual disability. He was on Social Security. That's his brother. He had a sister who was on for mental health issues. And then he had a father who was on for a head injury. So there were other members of his family that were on Social Security because of that. So, yes, that is – that was relevant to his application. And I want to point... Yes, Your Honor. I'm sorry. Do you have a thought you want to finish with, Judge Hamilton? Go ahead. I've got a question for you then. No. All I was going to point out is really in terms of adaptive functioning, the Social Security records are not helpful to Mr. Webster at all. In fact, Dr. Hackett provides some of the sort of best statements that sort of help with the government's theory of Mr. Webster's intellectual capabilities when Dr. Hackett, who gave him an IQ test that also assessed his other functioning, said Webster was a conman, very streetwise. He was a predator. He would take advantage of other people. He was a user of others. That's Exhibit 21 at 22 through 24. Unfortunately and sadly, that predicted the crime that happened in this case. And so Dr. Hackett was correct. That's the type of evidence. That's why I want to point out the district court did not rely on any of these assessments in its discussion of adaptive functioning. Instead, it relied only on handwriting that may or may not have been Mr. Webster's and that clearly could not have alone supported an intellectual disability finding. Ms. Simonson, I have two questions for you. I'll say I was taken aback a bit by your argument that Judge Lawrence in southern Indiana did not pay adequate attention to the record coming out of Texas. And the reason I was taken aback by that is I don't remember you all arguing that in the brief. Now, I know you're not on the brief, and we're right in the middle of oral argument now. All I can see from reading these things a couple of times is a reference at the bottom of page 51 of the blue brief to the Texas record. But I don't remember one other argument you made, and certainly not an argument with any particularity. Have I misread the briefs in your judgment? The thrust of our argument was, yes, there and also in our reply brief where we talked about how the trial court made an extensive record. So in the reply brief, that was ignored by the district court in terms of not giving adequate weight. And then when we talk about the various domains— But you advance the argument with any particularity. In other words, that there's this or that aspect of the record coming out of Texas that's at irreconcilable odds with this particular finding or that particular finding made by the court in southern Indiana. Yes, we do, Your Honor. In the conceptual domain, we talk about the test that there was a lot of evidence about at the original sentencing, the ABLE test, the MAT-6 achievement test, and that were ignored by the district court. We talk about his girlfriend's testimony. Excuse me. Weren't both of those tests the subject of pretty extensive expert testimony in both Texas and Indiana? They were, Your Honor. The district judge provided—I don't recall the specifics off the top of my head, but I thought he gave pretty specific explanations as to why he didn't give those much weight. I'm going to answer that question, Your Honor, and then reserve the rest of my time for rebuttal. But the problem with the district court's decisions here in Indiana is that he basically relied on the same type of testimony that the Fort Worth judge rejected in his original 1996 decision that Mr. Webster was not intellectually disabled. And you can see that from the 2003-2255 decision that Judge Means issued. He rejected that type of analysis and that the district court in Indiana flipped it and went with that type of testimony. I will reserve my remaining time for rebuttal. I have one other question for you, and perhaps Judge Kaney will indulge you with a bit of extra time in light of this question, but it's an important one to me. And that is to understand the government's view on whether you're contesting the district court's finding on intellectual functioning. In other words, I want you to set everything else aside you've been featuring, for reasons I understand, adaptive functioning. But is the government challenging the district court's finding on intellectual functioning? We are not, Your Honor, because that was really never the crux of the case. Judge Means explains that in his 2003 opinion. And that kind of puts some of the malingering issues aside, because whether or not he malingered on certain tests, that goes to intellectual functioning in terms of the IQ tests where that was heavily discussed. And even if he did or did not, his range was such that the judge in Fort Worth assumed that that was met and looked at adaptive functioning. And so because the majority of evidence and really the clearest indication he's not intellectually disabled comes from adaptive functioning, yes, Your Honor, we're only pushing adaptive functioning. Okay. Now, for me, the reason that I'm asking that question, that's exactly what I thought you would say, and I think that's completely true to your briefs and your presentation in our court. I think that that, in my mind anyway, that creates a difficult circumstance for you on the conceptual domain, because that Venn diagram overlaps, materially so. So what Judge Means concluded, because if you just think about the types of evidence we're looking at, it's really not different than what he was looking at in 1996. He concluded that IQ tests did not provide the most accurate measurement of how, in this conceptual domain, Mr. Webster would function. And there were other tests like the ABLE test, like the MAT-6 achievement test, along with other types of things, like he looked at what the educators said about Mr. Webster, the teachers, the counselor, the principals, and how they said that he functioned higher than their students that had intellectual disabilities, that they never saw that he was in need of services that were special education services, which we do not agree that he was in special education. I will put that out there. And so that went to conceptual, along with other things in terms of what Dr. Hackett, for example, found in terms of his level of executive functioning, ability to be a con man and a predator and very streetwise, and a lot of the things that happened not only during the crime in terms of the lies that he made to many different people about what happened and the planning that he put into it, but also there were other things that he did in the detention center prior to trial, like he hatched a plan to have sex with female inmates. He knew the times that would be best to go in the visiting center. He knew where in the visiting center to sit so that he could have sex with these female inmates, and he wrote a letter to a fellow inmate about it when he tried to break out of the detention center. All of these things are relevant to the conceptual domain, and you really have to look at what the original judge in Fort Worth found on that because he weighed the same thing. He just reached a different conclusion on basically the same evidence. I'm happy to reserve the remaining time for rebuttal. I'll give your side three more minutes, so you can use it however you want. Thank you very much, Your Honor. Mr. Wells? Thank you, Your Honor. May it please the court, Steve Wells on behalf of Bruce Webster. Let me start with the evidence before the court on the intellectual disability issue. First, what the trial court did was to not only consider all the trial evidence, but it considered it in context, and I'll come back to that in a second, but it also credited the testimony of Drs. Reschle and Fabian, and it said specifically that that testimony was credible, and within the testimony of Drs. Fabian and Reschle, there is a mountain of evidence, a mountain of evidence that Mr. Webster suffered from adaptive deficits. We had Woodcock-Johnson achievement test administered by Dr. Reschle that showed Mr. Webster operating at a, for oral comprehension and math skills and writing, essentially at a second or third grade level. We have the testimony, the importance of the fact that Mr. Webster failed the first grade. We also have the experts identifying the importance of being in special education. And here's something that was not before the trial court because the government was pushing a false narrative. The narrative at trial was that Mr. Webster was lying about being in special education, and we now know from the Social Security Administration records that we achieved that he, in fact, was in special education, unless the government is, their theory is that if you're not really in special education, you get a letter saying we've destroyed your special education records, which I have to say is just absolutely ridiculous. So we know that there was a lot of evidence before the district court here that the district court credited and said was very credible. It was not before the trial court. We also have all of Dr. Fabian's analysis, his neuropsychological evaluations, showing that Mr. Webster was a concrete thinker, and the explanation for that, showing that Mr. Webster failed a number of the neuropsychological tests, failed in the sense that he was significantly limited. None of that was before the trial court. And let me come back to what was before the trial court now because I think it's very interesting that the government is making this argument right now. So a lot of those witnesses who were paraded by the government back at the time of trial, including several of the witnesses who were apparently just dead wrong about special education, were saying, oh, well, he didn't look retarded to me. I didn't think he was really retarded based on my experience. Other kinds of evidence was evidence of how he acted in prison. Other evidence was his participation in the crime. Well, one thing that happened between trial and today that was not considered by Judge Means, because it couldn't have been considered by Judge Means, was Moore v. Texas 1 and 2. And Moore v. Texas tells us very specifically we should not be crediting lay witnesses who come before the court and say he looks mentally retarded to me. There's no science in that at all. There was no science in that at trial. Moore v. Texas also says we should give great caution before giving any weight to prison evidence because it's a structured environment. And our witnesses, Your Honors, Drs. Rescheli and Fabian, talked about why that is. People, their adaptive skills can improve when they're supported in a very, very structured environment of prison. That's number two. Number three, Moore tells us we should not be relying on crime facts. In fact, it eliminated the Berseno factors that were used in Texas at the time in which the reliance on crime factors, evidence, claims that somebody was a leader or that they planned the crime. There's no science in that either. And Dr. Fabian explained that at trial. He explained specifically to Judge Lawrence why we should not be crediting that kind of a testimony. It has no place in the diagnostic factors that are applicable under either Moore, under the AAIBD manual, or under the DSM-5, all of the manuals that deal with diagnosis. So there were a lot of things before the trial court here that were not before the trial court or that were improperly considered by the trial court. And to say that, oh, well, the judge only spent four pages of his opinion on adaptive deficits is to overlook, as I said, the mountain of evidence that's within the testimony of Drs. Fabian and Rescheli that he did credit. So I think that that's really important. Now, the government is now sort of aligning the Social Security Administration records. Well, the problem is Dr. Rescheli and Dr. Fabian talked about the importance of those Social Security Administration records too. And they now say, oh, well, it's just the handwriting. That's all that's bad. It's bad handwriting. Oh, and maybe he didn't even write those himself. Well, number one, Dr. Denny, their own witness, said that that was Mr. Webster's handwriting on those records, number one. Number two, Drs. Fabian and Rescheli talked about those documents and how they show a number of things that are specifically related to adaptive deficits, information that was not before the district court and Judge Means at the time of the original trial. For example, they talked about how it shows concrete thinking, how it shows poor syntax, poor grammar, poor comprehension. We have, just to take one of many, many examples that were cited by Drs. Rescheli and Fabian, he's asked them if he's ever had a job. The answer is cement. The next page goes on, in case you have other jobs. What does he write in? Cement. The third page, just in case you have some other jobs, what does he write in? Cement. So, Drs. Fabian and Rescheli explained why his responses on these forms were relevant to adaptive functioning. And all of that, all of that was credited by Dr., I mean, I'm sorry, by Judge Lawrence. There's one more thing that I want to point out, too. Mr. Wells? Yes, Your Honor. It's Judge Scudder here in Chicago. I got a question for you. I totally understand why you're focusing on the two experts that the district court credited. I'd like to hear you comment on the district court's treatment of Dr. Denny. And, in particular, the treatment that comes in footnote 21 of the district court opinion. What I'm wondering about is whether the very broad categorical conclusion that the district court reached, if you're looking for it, it's at the back of the brief on 33. That's a very, very broad conclusion that's reached about Dr. Denny. And why, in your view, does that not reflect clear error? Your Honor, a couple of responses to that. So, number one is, I think we can tell that there is, that that is a well-taken criticism, that Judge Lawrence's criticism is well-taken by the number of times that the government refers to Dr. Denny in their brief as support for their current position. Which, as far as I can tell, maybe there's one reference, maybe there's two. I'm not sure there's any. They do not rely on Dr. Denny for their argument that there was clear error. And, Your Honor, it isn't just footnote, to get to Your Honor's question about footnote 21. There's other evidence in Judge Lawrence's opinion, statements about Judge, that Judge Lawrence makes, about why he's not giving credit to Dr. Denny. One was that he had said that Dr. Reschle had incorrectly given a test of malingering or effort by only providing two of the three subjects. In fact, that was completely wrong, completely wrong. And Dr. Denny had sat through all of Dr. Reschle's testimony. He had sat right there when Dr. Reschle testified about it. Second, he accused Dr. Reschle of not having a license. And that was in the state of Indiana, when, of course, Dr. Denny didn't have a license in the state of Indiana. He also, Your Honor, and this is all in Judge Lawrence's opinion, Judge Lawrence also says Denny again and again and again refused to acknowledge the contrary evidence that was – the evidence in the record that was contrary to his opinion. Evidence, for example, that with respect to the Abass test that he had administered, evidence of the Woodcock-Johnson achievement test that Dr. Reschle had administered, failed to really take into account any of Dr. Fabian's tests at all. And so this failure to address and deal with and incorporate into his opinions and recognize contrary evidence, evidence that was inconsistent with his opinion, Judge Lawrence said was fatal. And in fact, the reason he placed so much weight on Dr. Fabian is Dr. Fabian did the exact opposite. Dr. Fabian acknowledged that there was evidence like, for example, this Matt and Abel test, which I'll come to in just a second, out there. And he explained exactly why those tests were entitled to little or no weight and the other tests, the tests that were individually administered, were entitled to substantial weight. So there's no clear error here. There is a well-reasoned, explained decision by the district court judge about why he was going to discount and not give weight to Dr. Denny and contrasted that with the experts that were presented by Mr. Webster, who did exactly what the judge thought real experts ought to do. I don't know if, you know, Ms. Simonton can speak to it. I don't, the government has certainly lessened its reliance on Denny. I don't think they've abandoned Dr. Denny. And I know, Mr. Wells, that's not what you're saying. But they've lessened, it seems to me that your point, your point is fair that they place a lot of reliance upon Dr. Connor from the Terre Haute facility as well as, is it Dr. Blessinger from the same facility. Is that the point you're making? Well, I'm making the point they place a lot more emphasis on that, Your Honor, than they certainly did before trial and in the post-trial findings. When they were, I mean, if you look at their post-trial brief, they are trying to support Dr. Denny. They are no longer trying to support Dr. Denny. I mean, you know, Your Honor, this goes to a very important point, I think, because this is also another difference between what was going on at trial and what was going on in the hearings here. Which was the government narrative at trial, again false, was that Mr. Webster was faking, faking all of his tests, all the standardized tests were being faked by Mr. Webster. That argument does not show up in their brief at this point, because that was one of the narratives that was pushed by Dr. Denny. And it was utterly refuted by all the evidence that was presented by Drs. Roeschel and Fabian again. And so they're left with, Your Honor, to get to your point, they're left with Dr. Connor and Dr. Blessinger. So Dr. Blessinger met with Mr. Webster on sort of routine prison check-ins for, in her words, maybe an hour at most over a period of six or seven months. She made no attempt to make any kind of diagnostic assessment of him. She didn't say she was trying to diagnose him. Again, very cursory fleeting. And all of the evidence, Your Honor, is that that is not the exercise of clinical judgment. A five-minute interview, a ten-minute, you know, how are you doing today, is not the exercise of clinical judgment in making a determination as to whether somebody is intellectually disabled. Dr. Connor, same thing. Very fleeting. You know, a few minutes here, a few minutes there. We went through, I don't know, 19, 20 of her interviews, so-called interviews with Mr. Webster and her prison check-ins. They were a few minutes at most. So, again, very fleeting contact, no attempt to make any kind of diagnosis. Dr. Connor, in fact, didn't know what the diagnostic criteria were. She just said she didn't even know how to diagnose intellectual disability and couldn't recite the criteria for it at trial, even though she had made an attempt to look it up before she took the stand at the hearing. So, there's no credibility with respect to any kind of statements that they made with respect to Mr. Webster or his adaptive function. And there's certainly no clear error on the part of the court in giving those fleeting and superficial encounters with Mr. Webster in any considerable way. And certainly not when you think about, again, the mountain of evidence, the tests, et cetera, with Drs. Rushley and Fabian conducted. The other thing I want to point out about the prison evidence, Your Honor, in addition to the fact that Moore versus Texas says we should be very cautious about that and we should not rely on that. The other thing I want to point out about is that the things that they say that Mr. Webster did in prison are all consistent with intellectual disability, using a computer, playing a guitar, talking, even reading a newspaper. That's all in the testimony of Dr. Tessay, which was uncontradicted by any other witness at trial. And Dr. Tessay testified that, unfortunately, there are a lot of common misconceptions, even among physicians, about what the intellectually disabled can do. Probably most people wouldn't think that the intellectually disabled can drive a car when, in fact, 39% of them, according to one study, actually have a driver's license. Most people would think that people with intellectual disability can't read. Totally wrong. Most people would think that people with intellectual disability, according to Dr. Tessay, can't use a computer. Again, completely wrong. So in addition to these fleeting and inconsequential contacts that we have between Drs. Flesinger and Conner and the fact that they weren't engaged in any kind of diagnosis and that Moore tells us we should be very cautious about adaptive functioning in prison anyway, we have the fact that what they said is essentially meaningless and not inconsistent with intellectual disability. Mr. Wells, at the risk of indulging in some of those stereotypes, let me ask you to address the evidence that Mr. Webster was living with his girlfriend, was managing money, living independently, etc. So Your Honor, I don't think there's any testimony that he was actually living independently. He always lived with somebody else, which is not living independently, again, according to the experts here in this case. He lived with girlfriends. He lived with his mother. They told the interviewers, they told Dr. Reschle, who spent a lot of time with them interviewing them, that they basically did everything. They had to go shopping for him. He did not provide for them. He did not have a job for more than a few days or weeks. He had one job that he lost as he slept on the job apparently moving cement around, and he had one sort of parts and rec job that lasted maybe for a period of weeks where he's picking up trash. And that was the sum and substance of his work history. And so he wasn't living independently. He wasn't providing for the people that he lived with. The testimony is that he was on food stamps. And Your Honor, the testimony about that time in his life is replete with evidence that he, at age 13, still couldn't tell time. He couldn't play cards with people because he didn't know the difference between spades and clubs, and he couldn't follow TV shows. He apparently couldn't tie his own shoes when he was eight years old, and he was reading, according to one teacher, at a third or fifth grade level while he was in high school. So none of the evidence about what he was doing when he was a kid would establish that he – would contradict the notion that he had adaptive functioning deficits. In fact, they all concur. And if we ticked off each one of those domains – and remember, Your Honors, he only has to show a significant deficit in one of the three domains. If we look at the conceptual domain, we have the achievement tests, the ones that were administered at trial, the ones that were administered by Dr. Reschle. We have the standardized tests that were administered by Dr. Reschle and by Dr. Denny, the boss that he gave to Dr. – that he gave to Mr. Webster and he gave to others. We have the fact that he was – that he failed first grade, that he was in special education, that his – it's very clear that his intellectual function, that his – that the conceptual domain was a real struggle for Mr. Webster. And that was confirmed too, again, by the poor comprehension, the poor syntax, grammar, understanding that's reflected on the Social Security Administration records. Mr. Wells, why don't you respond to your adversary's point about reconciling or attempting to reconcile what happened in southern Indiana with the very substantial record coming out of the Texas litigation? Isn't that a fair point? No, Your Honor, I don't think so, for the reasons that I mentioned before, which is that a lot of the evidence that came out at the time was evidence that Moore would tell us today we're not allowed to rely on, essentially. This is the lay witnesses who talked about that he looked retarded or that he acted retarded, that he didn't act retarded, that he looked okay to them. That's all – Moore says we can't use that. Yeah, but the testimony, is that really fair to the record in Texas though? I mean the record, as I understand it, or the evidence coming out of Texas was a lot more than people's visual perceptions of Mr. Webster's capacities. Well, there was evidence. I mean I'm not saying that it was all visual. I'm not saying that they were saying that he just looked retarded. I'm saying in their interactions with him, they were describing him as being not retarded. They didn't think he was retarded. And that's – what I'm saying is that is evidence that Moore would tell us today would probably not even be admissible at this point. But that's not my only point. My only point is they relied heavily on prison evidence. And they also relied on things like group-administered tests like this Abel and Matt, for example, versus individually-administered tests where we actually know what was the test that was applied. We know who gave it, and we know that there was no chance for copying or assistance or anything else. And Moore tells us that that's really important too. And they also relied heavily on crime evidence, Your Honor, which today under Moore, the court tells us that we should not be – that we should be very careful about that because it is not part of the diagnostic criteria. So I don't think it's the case at all that we can sort of compare what – I mean we can compare what happened then with what happened now. There's a lot more evidence now that goes to the Security Administration records, all the things that Rushley and Fabian testified to. But we also – I think the court has to deal with the fact that Moore would say we're not even supposed to be considering the kind of evidence that they had at trial, or it should be used with extreme caution, which there's no indication it was during trial. If I could turn to the second argument, the argument about diligence just briefly. So let me just make a couple of points about this in the remaining time. The first is obviously this is a clear error determination, but it's sort of – it's clear error of cost. The cases make very clear that in a clear error analysis that where the district court is basing its decision on credibility determinations that that is given special deference above and beyond the normal deference given in clear error. And in fact, it's the U.S. v. Clark case says specifically that credibility determinations can virtually never be clear error. So we have a district court that sat a few feet away from Larry Moore, the trial counsel, during his entire testimony, watched how he testified, watched him under very rigorous cross-examination, watched his body English, watched his eye contact, watched the tenor of his voice and how he answered questions and whether he was responsive and truthful or not, and made a very explicit credibility determination that he was credible. And that, Your Honor, it's also very clear that that credibility determination is based at least in part on Mr. Moore's history as a prosecutor. He had handled at this point prosecutor and defense attorney. He had handled over the course of his career 60 capital cases, both as a prosecutor and as a defense attorney. As a prosecutor, he had prosecuted three capital cases and sought the death penalty in three and was actually successful in one, which resulted in a prisoner's execution. So this was not sort of a wild-eyed defense lawyer who was willing to say or do anything for his client. This was a very well-respected and careful attorney. And that obviously plays into the credibility determination. Mr. Wells, could you address this problem the government has raised about refreshing recollection without apparently being able to identify anything in particular with respect to these contacts with the Social Security Administration in a story that does, frankly, get better over time for Mr. Loebster's position? Yes, Your Honor. So let me say this. There's nothing inconsistent or implausible about Mr. Moore's testimony, and let me go through that and explain why that is. So they zero in on the 2009 affidavit, and the 2009 affidavit is given at a time when, as the court has already acknowledged, Mr. Moore said he didn't have access to his file and didn't review the file. His statement that he had a good faith belief – no direct recollection at the time, but a good faith belief – was based on a completely unrefreshed recollection, no access to his file whatsoever. Now, the government likes to leave that part out, that he hadn't actually had any part of his file, and look at it. But that is a cold recollection coming years after the event. Now, in 2018, it's not true that there are no records about what went on here. In fact, there's extensive records about what went on here. They may not be as complete as the government wants, but there are extensive records here and plenty that would give – that just give a common-sense explanation to why memory would be refreshed. So there are handwritten notes. Let me back up. First off, the file reflects, for the first time apparently in Mr. Moore's recollection, that this information came to him right before the voir dire, right before the picking of the jury, the last week of February. So there's no indication that he had any knowledge about that before, but the file obviously would show when all this happened. So he begins to know now the date about when he got this, and then he remembers who he got it from, which is Mrs. Webster, who is also intellectually disabled. And then in the timing context, it's also clear now from the file that he is in voir dire the very next week when a lot of the communications were going on. So he's actually in trial. In the file, there are documents that identify who was involved with the requests, Mr. Strickland and Kim Whitehead, the paralegal, what precisely was requested, any records having to do with anything having to do with Mr. Webster's disability application, the timing of those requests, including transmittals and receipt information about when that was done, and again, exactly what was asked for. So it doesn't contain a note saying they told me they didn't have any records. But he had two statements about that. Number one is part of his trial is still missing. It was out of his control and out of our control for a good 10 or 12 years. But even if he didn't, Your Honor, he was in the middle of voir dire apparently when he was having these communications. And we know that too, Your Honor. We know that this is new because he had to actually go to Bruce Webster and get a special – and have Bruce Webster sign a special release identifying or asking specifically for Social Security Administration records in the form that they would allow. And he had to go to jail to do that, and then that jogged his recollection as to that too, even though there's no – nothing in the file that says I had to go to the jail and have Bruce sign this. So the theory apparently is that unless there is an exact match between the records that are used to reflect – to refresh somebody's recollection and the recollection itself, that the witness is lying. And they don't make any bones about it. They don't say, well, maybe he's mistaken. They make it clear he's lying, and not lying once but lying three times. And there is just no basis to say that. Again, there's nothing inconsistent about any of these affidavits. The 2018 affidavit is not inconsistent with the 2009 affidavit because the 2018 affidavit says now I've reviewed my file, and here's what I remember after reviewing my file. If I could interrupt for a second. I understood Judge Lawrence's reasoning to be, look, Mr. Moore is an experienced, sophisticated defense lawyer in these circumstances. He certainly was focused on the importance of evidence of intellectual disability. And in essence, if the Social Security Administration had been even equivocal about whether they had such records, he would have pursued that further. He didn't. And in essence, a lawyer ought to be able to treat a government office's response that we don't have the documents you're looking for as facially trustworthy. Is that the logic? I think that's part of the logic, Your Honor. I mean, part of it is you don't have to go back and put people under subpoena and get them to testify to that in court if you don't have a reason to disagree with them. Right, Your Honor. And I would add this. What the government is essentially saying and what Judge Lawrence rejected is that Mr. Moore should have assumed that this governmental employee, and incidentally, he did not say he knew it was Hal West. He said he didn't remember and he thought it was Hal West, but that this government employee that he talked to was lying to him. That's the government's position, is that Mr. Moore should have assumed that he was being lied to. A violation, incidentally, Your Honor, of 18 U.S.C. 1001, which makes it a felony for a governmental official to knowingly lie to a constituent. So that's the government's theory here, is Mr. Moore should have assumed that he was being lied to and then should have engaged in sort of follow-up through the court subpoena, some sort of other maybe extrajudicial self-help. But there's no basis for that. And Your Honor, if that's the standard for diligence, can you imagine what would happen to the ineffective assistance of counsel cases in which the diligence of trial counsel comes up all the time? And if it's now not reasonable diligence to take the word of a federal government official about the existence of records, but you have to follow up with a subpoena, the floodgates will open on ineffective assistance of counsel. And so there's just no basis for this. That's not reasonable. There's no clear error in making that determination. That's plausible. That makes perfect sense. So, Your Honor, for those reasons, there is nothing inconsistent about these affidavits. Memories get jogged. There's no requirement that whatever you use to jog a memory, whether it's a Madeline or an old sock or a writing, be exactly parallel to the refreshed recollection. And we all know from common experience that that's not true. That's not the way memory works. When you put yourself in the time and the place when something happens, you remember events far beyond what's written down. I see that my time is up. Thank you very much, Your Honor. Judge Kaney, can I ask Mr. Wells one final question? Sure. Mr. Wells, I'm not asking this at the end because, you know, with any special importance, it's something I just couldn't figure out from trying to prepare for the case a bit. And maybe the government will want to address it, too. But the government is to reply brief, as you know, presents a table or a chart, and it's a compare-contrast. And the first column of that chart sets out Mr. Moore's 2000 affidavit. My question is, I have some sense of why the 2000 affidavit was prepared, but can you fill those blanks in for me? What was the point and purpose of it? What's the context? Well, I don't – I'm not sure there's anything in the record about this, but I believe – and I'm looking at my colleagues here to make sure we're in the room with me now. But I believe it was in connection with the 2255 that was submitted. Sure. It seems to me that it was in connection with – and maybe somebody can correct me if I'm mistaken. But the impression I took away was that it's definitely post-conviction relief, and it seems to be in the context of some kind of ineffective assistance argument about a mitigation specialist. Yes, there was. So we're not talking about Mr. Strickland now, Your Honor, which was the ex-FBI agent who was attempting to get these records that we should talk about. There's a mitigation specialist, and apparently there was some – I don't know exactly what happened, but apparently she kind of dropped out of the picture at some point. And I think there was a claim by 2255 counsel that that – something in connection with that. Maybe Ms. Neely-Cox can shed some light on it. I'd also point out, Your Honor, that obviously, although that's part of the chart that they come up with, in 2000, no one knew these Social Security records existed or had any reason to believe they existed until that time. I totally – I get your point that you should just take a big pencil and mark an X through 2000. It doesn't have – it's neither here nor there, but it's in the reply brief, and I want to make sure that I consider it. That's right. And I would point out too, Your Honor, just before I sit down, is there are a number of other inaccuracies about that chart. For example, the government claims that Mr. Moore was told that the documents were destroyed. He never said that. He said he was told they didn't exist. And there are a number of things like that, and I would just urge the court to look very carefully at that chart because we didn't get a chance to reply to it. It's very misleading, and frankly, the government chisels on the facts on those and makes things up because there is no testimony. Mr. Moore did not say that he knew that he talked to Hal West. He's equivocal about that, and he also did not say that the records were destroyed. Thank you. Thank you, Ms. Wells. I'm going to address the second issue about adaptive deficiencies and then hand it over to Ms. Neely-Cox. On adaptive deficiencies, it is simply not true that the evidence that the original district court considered in Fort Worth does not square under Moore. It is not true. In fact, the district court, you should look at his words, his words himself about all of the evidence. He considered a giant universe of evidence. He didn't just rely on prison conduct. He didn't just rely on crime facts. He relied on all of these people who knew Mr. Webster through the years in different contexts. And it is, frankly, insulting to say that Judge Means found Mr. Webster not intellectually disabled simply because a bunch of witnesses got up and said he didn't look disabled. That is not what happened. A lot of witnesses testified about various specific aspects that go to adaptive functioning domains, the way he communicated, the way he handled money, the way he handled relationships, his memory, all of the things that are necessary. And where do you think the evidence that the experts comes from? It comes from these people. It comes from the family members and the girlfriends and the investigators and the past employers. It's not like the experts do anything different. They go out and they interview people. The only problem is Webster's experts have only ever relied on the people who give answers they want, whereas the government's experts, for example, Dr. Parker, the original sentencing, he relied on a much wider range of people who explained what Mr. Webster was like, including the educators. And that was part of what Judge Means relied on. CERT was denied on that intellectual disability finding. The Supreme Court did not take it up. And to argue that now you should categorically reject some of the testimony from that sentencing, the ship has sailed on that. And Moore, moreover, did not say that you cannot consider prison conduct and you cannot consider crime conduct. The problem in Moore was, one, there was a test, an outdated test that the Court of Criminal Appeals used that was not aligning with current psychiatric definitions of intellectual disability. Two, the problem was that seemed to be the only evidence that the Court of Criminal Appeals was relying on to find Mr. Moore not intellectually disabled was his prison conduct and his crime conduct. And that did not align with what people said that Mr. Moore was like outside of that context. Here it all aligns. The only way Mr. Webster is able to establish that he is not intellectually disabled is to cut out categorically large groups of evidence, the test scores for things that he said, well, they are invalid because they weren't individually administered. But we have lots of evidence that there were anti-cheating protocols for any group-administered texts, and I don't even think it's in evidence as to whether the ABLE was group-administered or not, by the way. Also, prison conduct before and after trial. The problem for Mr. Webster is that cuts against him because anyone who hatches a plan to have sex with female inmates and knows where the video cameras are and when the best time to do that is, and who can pick a lock and find his way to the female section to rape someone in the shower stall, that's where he was found, is not compatible with the picture that they have tried to paint. Also, the educator's statements. Dr. Reschle, Dr. Fabian, they discounted those statements because the picture of Mr. Webster that was painted through their statements and the MAT-6 score did not align with the idea that he had adaptive functioning deficits. And then, of course, the fact related to the crime, including all his memory about where Lisa Renee's grave was located. He's the only one who could show them where he burned her clothes, all the lies he told everyone to cover up what he had done. That he was the one who orchestrated that crime, who was the one who decided to kidnap her, when to kidnap her, where to go. He rented the hotel room. He had them comb her pubic hair to get evidence out. He had them clean the room and the car. This is not the same person that Mr. Webster's experts are saying exists. And for that reason, we ask the court to reverse the district court in Indiana's finding that Mr. Webster has significant adaptive deficits. And to reinstate the sentence that the original district court in Fort Worth imposed upon Mr. Webster based on 1,200 pages of evidence. Thank you. Ms. Mealy-Cox, I'll give you a minute. Thank you. So I just want to correct one thing regarding the due diligence argument that counsel said. So, for example, our position is on the due diligence argument, that you can credit everything that Moore says with respect to his now renewed and refreshed memory, even though there's nothing to refresh it. But counsel said that we are asking him to believe that he should have assumed that he was being lied to by the government agents who told him on the phone that no records existed. And that is not at all our position, not at all. What our position is, there has to be some level of due diligence. He doesn't have to believe he's lying. He could have easily asked for a document referring that there was no records. In fact, that's what he did with another government agency where there were no records. But we're not even expecting that. He doesn't even have to do that. He doesn't have to do any follow-up with the Social Security Administration. All he has to do is make a note in his file. It could be a posted note. It could be his paralegal making a note because he was in board R. It could be his investigator making a note. But none of that exists in the file. And if you're going to credit Moore's testimony, you have to also say he admits he did nothing to follow up. So he's saying he did nothing to follow up, and on page 116 of that testimony, he says that he may not have asked the Social Security Administration to document that they had no records, and it would have been a big oversight if he hadn't. So he even admits that if he didn't do anything with respect to the Social Security Administration, it would be a big oversight. So we would just ask the court on the due diligence argument that you don't have to make a credibility finding. You can accept all the credibility in the record and still find that there was not a level of due diligence that would get him through the threshold. And if I could just have – Why – if we are crediting his story, why would the existence of a note in his file make a difference? Because there has to be a level of due diligence. You have to say, like, if you hear that there's no records of a disability determination in the negative that was made less than 18 months before, you should be at least documenting your file, because you're a disability lawyer. You know that this record is going to go on and on and on and that it's going to be – Counsel, sure. We have a flaw in recordkeeping and documentation apparently in the middle of trial. But if we are crediting that he, in fact, made the request and was told the documents don't exist, what additional due diligence do you think we should expect? I think the additional due diligence, Your Honor, is that you're sitting there 18 months after a decision has been made by the Social Security Administration to deny benefits, and you're going to just accept a phone call that says we have no records, that you should at least ask the Social Security Administration to say, okay, give me a document, saying that you have no records. In fact, many years later, the evidence in the record is that Dorsey did that, and the Social Security Administration was perfectly willing to give them that evidence. It came very easily. But that would have been taken contrary to policy, right? Well, the contrary to policy was that the records were not given out without being paid for. It's not some massive conspiracy between the Social Security Administration not giving records knowing that it was a death penalty case. If I could just have one moment to wrap up, Your Honor. Ms. Neely, let me ask you a question before you do that. It's on this point, okay? And I think it's significant in this sense. I don't know that the way you describe what went on with the absence of records aligns exactly with what Mr. Moore is saying. In other words, let me put the question this way. Is the government's view that Moore's trial file, the file that he reviewed in connection with preparing the 2018 affidavit, is it your view that that's 100 percent complete? It is our view that there's no evidence that it's not. Other than his testimony? Other than he made a remark that some things have been missing, and he was very equivocal about it. No, no, no. He didn't say some things are missing and equivocal. He says on page 87 of his testimony, I don't know because a big part of my notes from the investigation and trial of this case are not in the file at this point. There's subsequent dialogue about it, as you know. You know the transcript as well as I do. And the subsequent dialogue at each point, he pushes back on questions about why isn't there a note, the same point you're making. And he says, I don't know. I don't know why there's not a note. I've looked at my file. I would have expected one. It's not here. That's why I'm asking the question. Is it your view that the file is 100 percent complete? Because he sure didn't think so. I guess, Your Honor, I would just refer you to page 94 of that same record where Mr. Moore says he doesn't know if he made notes. He does not know if he made notes. I don't know if I did or not, page 94, because the notes are not there for me to know. Our position, Your Honor, is that he doesn't have a recollection of what notes are missing. Then he says he may have made notes, but he may have not made notes. And there's no other evidence whatsoever that any counsel disposed of any of the records. The trial counsel, the 2255 counsel, and then Dorsey, they were very meticulous with the record on the trial file because everyone knows that it's going to be a lengthy appeal process. That's fair. I mean, it surprised me to see that the file, you know, he's got half a file or three-quarters of a file. I'm not sure what to make of it, but I appreciate your responses. May I have just one minute to wrap up? Yes, you may. Thank you. You know, when this brutal crime occurred, Your Honors, I was a second-year law student, and I remember it well. And the prosecutors that tried this case in our office have long gone, but we feel no less strongly about the evidence in this case. And as this panel reviews this record, I just want the panel to acknowledge that Judge Easterbrook's, what Judge Easterbrook presented in his dissent has come true, that a district court in Indiana in a one-day hearing 22 years after the fact can make a threshold finding that creates a conflict amongst federal judges in a new district in a new circuit that sweeps away Webster's original sentencing. We've talked a lot about the credibility findings that Judge Lawrence made, but what we haven't talked about are all the credibility findings that Judge Means made that Judge Lawrence didn't give any counsel to and no deference to, and there are many of them. Is it still the government's position that even if Mr. Moore is found to have used due diligence in seeking these social security records, that there was no procedural forum for considering those after the 2255 denial when those records were discovered? If I'm understanding your question right, Judge Hampson, are you asking do we disagree with the en banc decision that there should not have been, they should have not allowed this to be newly found evidence? I'm asking more broadly than that. Put aside the issues about exactly how and when these were discovered and just assume that counsel was diligent and through nobody's particular fault, significant evidence of intellectual disability is discovered after the denial of an original 2255. Is there a channel under federal law in the government's view other than the 2241 process adopted in the en banc decision in 2015? Your Honor, what I would say to that is we obviously argued very strenuously about allowing a whole new evidence to come in given the lack of finality and the fact that the court was making an exception that could allow this type of situation to occur, which is that 24 years after a mountain of evidence was heard by the judge, another judge in a very expedited manner is going to completely overturn the findings of the jury and the findings of the judge that were made with a mountain of evidence. So we argued strenuously for that and we do not believe that. Obviously, that's the law of the case, but we do not believe that there should have been a In the government's view, let's suppose this slam-dunk evidence of intellectual disability after the original 2255, it's just too darn late. Well, yeah. That seems to be your position. That is the position, Your Honor, but I just want to submit on this note that this was cumulative evidence. There was already pre-crime evidence of a mental health expert doing an evaluation of Mr. Webster in the record, and it was good evidence. The IQ came back, one of the lowest IQs that any of the experts found, and that evidence was put before the court and it was put before the jury and it was put before the judge. So everybody discounted that IQ result, even the defense experts, right? I mean, that was discounted, but what I'm saying is it's not like this is smoking gun evidence. This is cumulative evidence, and this issue was squarely before the court and 52 witnesses. And even in the October 2000 – I'm sorry, the 2000 affidavit bolsters this point, which is that Mr. Moore felt like he had a great case. He had five experts, and he was very, very surprised when the judge and the jury went the other way. Okay. Thank you for your response. So anyway, just to finish, I just want to recognize that the dissent has come through, that the Rene family has been waiting for justice for a quarter of a century, and that we would ask the court, given the evolving nature of trial counsel's statement about the Social Security records and the lack of any corroborating testimony or evidence in the file to support his memory, the district court clearly erred in finding that the records were newly available, and that even if the court wants to give credibility to those determinations, they could certainly find that this does not meet the due diligence standard. Thank you to all counsel, and the case will be taken under advisement, and the court will be in recess. Thank you. Thank you. Take care, everyone.